AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

DISTRICT OF _____ DELAWARE

### In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

▮▮▮▮▮ Wilmington,
Delaware, described more particularly
on Attachment A

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

REDACTED

CASE NUMBER: 05- *116 M*

I __ Anthony H. Crabtree _____ being duly sworn depose and say:

I am a(n) __ Special Agent, Federal Bureau of Investigation, _____ and have reason to believe
                                        Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

▮▮▮▮▮ Wilmington, Delaware, described more particularly on Attachment A

in the _____ District of _____ Delaware _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

listed in Attachment B of this Affidavit

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence of a crime

concerning a violation of Title __18_____ United States code, Section(s)__2252_____.
The facts to support a finding of Probable Cause are as follows:

Affidavit attached

FILED

NOV - 2 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Continued on the attached sheet and made a part hereof.    ☒ Yes    ☐ No

Signature of Affiant
Anthony H. Crabtree
Special Agent, Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

Date _October 13, 2005_    at    Wilmington, Delaware
                                     City and State

Mary Pat Thynge
Magistrate Judge

**ATTACHMENT A**
**LOCATION TO BE SEARCHED**

The residence, located at ███████████████ Wilmington, Delaware, is located west of the intersection of ███████████ and ████████ The residence is the first house facing█ on the left traveling west from the intersection of █████████ and █████. The residence is fully described as a small, one level, single family home with a red brick exterior on the front of house with white vinyl sides. The house has a gray painted over hang over the front porch. The front windows are framed in white. The number ███████is located on the front to the house.

## ATTACHMENT B

### LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

1.    Any and all materials depicting child pornography, any sexual conduct regardless of whether it is between an adult and a child or between children or child erotica. Any images, audio recording, visual recording, CD's, DVD's, digital memory, sketches, drawings, cartoons or other media depicting or portraying nudity, lewd or lascivious exhibition of genitalia, sexually suggestive poses, obscene material or any type of sexually explicit conduct as defined in Title 18, United States Code, Section 2256, to include but not limited to videos or CD's titled RBV 05, RF1 007, RF2 005, Crimea 06, KDV 15, Showerboys 3a-3f, RBM 71, RBV 73, RBV 08, RBV 02 and RBV 16.

2.    In any media or format, all address books, rolodexes, lists of names, list of characteristics of individuals, computer screen names, e-mail addresses, to include ████████████ records of the computer activity of any individual, addresses for personal web pages, and any and all evidence of passwords needed to access, any computer located at ████████████████, Wilmington, Delaware.

3.    Samples of BRUCE D. DUNLAP's handwriting to include but not limited to letters, notes and diaries.  Mailing material to include past correspondence received from ████████████   Mailing materials and other indicia of occupancy and/or ownership verifying DUNLAP'S residency at the above searched address, and/or other addresses.

4.    Any and all materials that would assist in the identification of Ray Alsop. Or any material addressed or pertaining to ████████████ Wilmington, Delaware, to include but not limited to handwritten notes, letters, envelopes, or packaging material.

5.    Computer hardware, software, documentation, passwords, and data security devices that were integral tools of this crime and constitute the means to commit it. These objects themselves may be instrumentalities, fruits, or evidence of crime, and/or the objects may have been used to collect and store information about crimes (in the form of electronic data).

THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF DELAWARE


## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT


I, Anthony H. Crabtree, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), Baltimore Division, Wilmington, Delaware Resident Agency, being duly sworn, depose and state as follows:

1.    I have been employed as a Special Agent of the FBI since December 1, 2002, and am currently assigned to the Baltimore Division, Wilmington, Delaware Resident Agency. Since joining the FBI, I have been involved in the investigation of violent crimes, white collar crimes, and terrorism activity. Since January 2004, I have been assigned to investigate Crimes Against Children that include Sexual Exploitation of Children (SEOC) violations of federal law. I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations. I have attended FBI Crimes Against Children Training as well as training in the Innocent Images National Initiative Undercover Internet Training.

1

2. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

## DEFINITIONS

3. The following definitions apply to this Affidavit and Attachment B to this Affidavit: a. "Hardware", Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

2

b. "Software", Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

c. Documentation", Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. "Passwords and Data Security Devices", Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

3

## BACKGROUND OF THE INVESTIGATION

4.    In April, 2005 your affiant was contacted by a Special
Agent of the Dallas Division of the FBI. Affiant was informed that
in February, 2005 Agents of the Dallas Division were contacted by
Detective Thomas Burns of the Rusk County, Texas Sheriff's
Department. Detective Burns advised agents that on December 27,
2004, � ████████████████ white male, ████████████ of ████
████████████████████████ was murdered while in his home
in Rusk County. During the course of the investigation a search of
the murder scene was conducted and a large quantity of child
pornography, depicting prepubescent boys, was discovered in
Vinson's residence.

5.    Detective Burns further advised that approximately two
weeks after the murder, ████ ████ cousin, ████████████ contacted
the Rusk County Sheriff's Department. ████████████ told them that
after his cousin's death the family had forwarded the victim's mail
to his ████████████ residence. Since that time he had received
three envelopes in the mail addressed to his dead cousin. When he
proceeded to open the letters he found them to contain child
pornography. Two of the envelopes also contained handwritten
letters written to the victim and signed with the name BRIAN. All
three envelopes were post marked from Delaware and had the same
return address on them of R. Alsop, ████████████ Wilmington,
Delaware. ████████████ subsequently turned over the three envelopes
to Detective Burns.

4

6.    On February 8, 2005, Detective Burns turned over the three above mention envelopes and their contents to the agents of the FBI as evidence. A subsequent review of the envelopes by agents of the Dallas Division of the FBI confirmed all three envelopes were addressed to ███████████ at his Overton, Texas address and were post marked from Delaware, with a return address of R. ALSOP at ███████████ Wilmington, Delaware. Agents of the FBI found the first envelope postmarked December 11, 2004, it contained two CD's, each containing child pornography depicting sexually explicit videos of prepubescent boys. Each CD also had with it a piece of paper containing the titles for each of its video segments. The CD's contained sexually explicit videos of prepubescent boys in the shower. The second envelope was postmarked January 2005 and contained a 10 page letter along with various magazine and newspaper clippings containing photos of prepubescent boys. Page 1 of the letter, which was signed with the name BRIAN, states:

> "The reasons why I has so many vids to send to you are many and varied; I've been saving the vids since I first found out how to download them from the newsgroups (I don't remember how long ago - maybe months, maybe more than a year - I don't keep track)."

On page 7 of the same letter the writer discusses the videos containing child pornography saying:

> "As for the pornographers, there was only one outfit - from Russia - turning out regular boy - boy porn recently. And they got caught in 2001, I believe. Their reign was from 1997 - 2001. They made the KDV, RBV (Russian Boy Video), RBM, RF (Russian Flowers) and RU-MB (Russian - Man Boy) videos. There are no other current on the web videos. All of them are old, and just circulate around and around. The "Crimea" series - supposedly from the Crimean area of Russia, are supposed to be recent.

5

The showerboys were all done in 2003, I believe. Everyone is waiting for more from him."

The third envelope, which was postmarked January 20, 2005, contained a one page letter also signed with the name BRIAN, and two CD's. These two CD's also contained child pornographic videos of prepubescent boys engaged in sexually explicit acts with each other. Some of the videos contained on the CD's are titled RBV 05, RBV 08, RBV 02 and RBV 16.

7.    On May 31, 2005 Detective Burns turned over to agents of the Dallas Division of the FBI, two large bags of material which had been previously recovered by his department from the home of ████████████. These two bags contained numerous items containing images of child pornography, to include magazines, CD's, video tapes, photographs and letters. The two bags of material also contained numerous postmarked envelopes along with  multiple letters. Some of the letters were typed letters to████████████, most were handwritten to████████.

8.    Agents of the Dallas Division of the FBI reviewed the material recovered from████████ residence which revealed a letter signed with the name BRIAN dated 12/11/2004. Enclosed with the letter were three (3) CD's each containing sexually explicit videos of child pornography involving prepubescent boys and two (2) sexually explicit photographs of a prepubescent boy. Some of the videos were titled RBV 05, RF1 007, RF2 005, Crimea 06, KDV 15, Showerboys 3a-3f, RBM 71 and RBV 73.   In the letter, the writer "BRIAN" states:

6

"I won't ever have a backlog this big again - I've been storing these up to put on CD for you and waiting for you to get your computer up."

Also discovered with this letter was a stamped unused/unsealed envelope addressed to Bruce D. Dunlap, ███████████████ Bellefonte, Wilmington, Delaware 19809-2341 with ███████████ return address.

9.   Agents of the Dallas Division of the FBI reviewed the material and further discovered, that almost all of letters and postmarked envelopes that were addressed/written to ████████ were signed with the name "BRIAN" and dated sometime during the time period from 1996 to 2004. The writer "BRIAN" wrote some of the following statements to ████████████ in these letters:

"Downloading (dl'ing) the type of pix we like is illegal   here in the states and you could be arrested for doing so,   but what do you think the chances are? If "the man" wants   you, he's going to get you, but I think the odds of getting     caught are infinitesimal."

"In 1976, when I went to court, the law was that you couldn't buy or sell any nude children mags, with or without erections or sex, but you could own them."

"Let me know if you got the pics I just sent (the ones on the list you sent me - including "z-french-poster." I weighed it at home and put postage on it, but didn't check the weight at the P.O., because the line was too long. So   if there isn't enough postage on it, it will be returned to the fictitious address (return) I had on it - so I will never know you didn't receive it. Guess I oughta, especially with legal age stuff, put my regular (shared) address on mail, huh?"

"I don't go to any sites that may be illegal, in my mind. I get the pics I get from the newsgroups, which I'll help you with after you get used to your computer."

7

"I just assume that all naked kid pictures are illegal, that way I'm not wracking my brain, trying to figure which are legal and which aren't.

"In regards to sex with men; when I was younger, I wanted only hairless boys, as I've gotten older, my likes have increased along with my age, like you said. Young, and some middle twenties look good to me now, and I know I cannot have a good relationship with a 13yo now, whereas I could even into my 30's. Now, it would just be a pay for sex deal, no feelings."

"OK, the first vid I sent is titled RBV-02. The dark haired boy is named Nick, and he is in other vids. I think the blonds is in a couple others."

In a letter dated 10/19/2004, the writer "BRIAN" writes:

"I don't know how many sexual-themed pics you have of underage, which could put you away but the CD is, no doubt, no excuses, a definite 5 to 10 years - no questions asked. There is no argument - you are guilty. I'll send another, it's your decision to keep it or destroy it, just be aware of the consequences."

"About the CD, this is a Russian film - there was an outfit over there that came into being late in 1997, and was busted in 2000. They used all poor and for the most part, street kids in their vids. The older boy in this vid is named Nick (don't know if that's his real name or not) he was very popular because of his size - for his age 12 or 13 to 14."

"The CD I'm sending this time has 12 different web-cam scenes on it.".......  " "As these are webcams they don't tell a story - no complete tale. Sometimes it's just a quick flash of dick - other times it goes all the way to climax."

10. Also discovered in this material were multiple postmarked envelopes containing pictures of various prepubescent boys, many of which were sexually explicit child pornography. On the postmarked envelopes containing images of child pornography the return address was Alsop, ██████████████, Wilmington, Delaware, 19802. On the postmarked envelopes containing non-pornography images of young

8

boys had a return address was Bruce Dunlap, ███████████████

Wilmington, DE 19809. Others were found with only the name "BRIAN"

written as a return address.

    11.  In a letter to ███████████ signed with the name "BRIAN"

dated 06/10/2003, the writer wrote:

> "With my digital camera, when someone wants a copy
> of a picture, I email it to them. You are the only person
> that I print out pictures for. All of my pictures, that
> I retain, are on the hard drive or on a CD."

> "When you get an e-mail account, you can e-mail me
> at ███████████████ (don't forget an underscore "_"
> between the "y" and the "d". Not a dash."

In a letter dated 06/20/2003, the writer "BRIAN" writes:

> "Also, I need to know what, on the CD I sent you,
> will play on your computer."

    12.  On May 15, 2005, your affiant received information from

the United States Postal Inspector's Office that the address of ██████

███████████, Wilmington, Delaware was not a good address and

did not exist in Wilmington, Delaware. Your affiant was also unable

to identify anyone in the state of Delaware with the name Ray

Alsop. Affiant was also verified with the United States Postal

Inspector's Office that an individual, Bruce Dunlap, white male,

born ███████ was receiving mail at the address ██████████

███████ Wilmington, Delaware.  On October 3, 2005, affiant

conducted a physical surveillance at the residence located at ██████

██████████████, Wilmington, Delaware. The vehicle parked at the

residence was a blue Toyota Highlander, Delaware registration

9

█████████████, registered to Bruce E. Dunlap, █████████████████

Wilmington, Delaware.

13.  On  June  13,  2005,  Agents  of  the  FBI  served  an administrative subpoena on Ask Jeeves, Inc, 1 Bridge Street, Suite 42,  Irvington,  New  York,  for  subscriber  information  for  e-mail address █████████████████  On June 23, 2005, Annie Cappeller, Director of legal affairs for Ask Jeeves, Inc, responding to the above  mentioned  subpoena,  advised  that  the  subscriber  for ████████████████as of June 23, 2005 was ████████████ of ███ ██████████████████████████████ Ask Jeeves Inc., also advised that the subject had last logged on June 22, 2005 at 9:34 A.M. EDT, using IP address ████████████████

14.  On July 21, 2005, ████████████████turned over to Agents of the Dallas Division of the FBI one envelope postmarked 14 December 2004 and addressed to ████████████████████████████████████████████ Overton, Texas. The letter which had a return address of Mr. Bruce Dunlap,  ████████████████████  Wilmington,  Delaware  19809-2341, contained a Christmas card signed with the name "Brian" and having the following handwritten note on it:

> "Hope you holidays – and the coming year – are filled with happy dreams of little things, and some happy times with some!"

15.  On July 27, 2005 Agents of the Dallas Division of the FBI conducted a search on IP address locator website "GEOBYTES" for IP

address ███████████ found that IP address ███████████ was handled
by the company Comcast and was assigned to a computer located in
Wilmington, Delaware.

16.   On July 28, 2005, Agents of the Dallas Division of the
FBI conducted a search of the United States Postal Service's
website for the address ████████████████████████████ found
that no such address existed in Fairfield, CT. A search for the
name ███████████████ in the Autotrak computer database failed to
identify anyone with that name living in Fairfield, CT.

17.   On July 28, 2005, Agents of the Dallas Division of the
FBI served an administrative subpoena on Comcast, 21 East Basin
Road, Suite 20, New Castle, DE 19720, for subscriber information
regarding IP address ████████████  On August 4, 2005, Comcast
advised that they were unable to produce subscriber information for
IP address ███████████ on July 28, 2005. While complying with the
subpoena, Comcast discovered that log files, they use to make
subscriber account identifications, were either incomplete or
contained an error associated with the registration of the cable
modem or other device in question. They further advised that
Comcast only retains subscriber records for a period of thirty one
days.

18.   On 07/26/2005, Your affiant conducted a choice point
computer database query confirmed that Bruce E. Dunlap, white male,
born ███████████, SSAN ███████████ currently resided at ███████

11

████████████████, Wilmington, Delaware 19809. Furthermore, your affiant was unable to find any criminal activity on behalf of Bruce Dunlap.

19. On 10/12/2005, the FBI case agent in the Dallas Division faxed to your affiant the documents appended to this Affidavit as Exhibits A, B and C. They constitute three envelopes and their enclosed letters from the two large bags of materials recovered from the Texas home of ████████████████ the subject of paragraphs 7 through 11 of this Affidavit. Exhibit A is an envelope and four-page letter; Exhibit B is an envelope and one-page letter, and; Exhibit C is an envelope and six-page letter. All three envelopes are addressed to ████████████████ at his Overton, Texas, address. Exhibit C has the following return address: Alsop, ████████████████ Wilm, DE 19802. Your affiant's investigation discloses, as referenced above, that this is a bad address with a false name. Exhibit A has the following return address on the envelope: ████████████████ Wilm, DE 19809. This is the residence to be searched. The two envelopes. Exhibits A and C, both are postmarked February 2004, in Wilmington, Delaware. Your affiant has reviewed Exhibit A, B, and C and concludes in his lay opinion, as your affiant has had no training in handwriting comparison, that the three Exhibits all appear to have been written by the same person. Further, the letter which is Exhibit A ends "Take care Brian" and the letter which is Exhibit C ends "Take care, write when you get

12

a chance. Brian." Your affiant appends the three letters as Exhibits A, B, and C so that the Court can make its own determination as to the similarities of the three Exhibits.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

20. Affiant has been informed that FBI Supervisory Special Agent (SSA) James T. Clemente has worked in the Behavioral Analysis Unit of the FBI since 1998. SSA Clemente has been a Special Agent with the FBI since 1987. As a member of the Behavioral Analysis Unit, SSA Clemente consults on child exploitation cases throughout the United States, South America, and certain European and African countries. Since 1998, he has received three Exceptional Performance Awards from the Department of Justice and a Superior Service Award from the FBI. In addition, he has received numerous letters of commendation from state, federal, and local law enforcement in connection with his work in the Behavioral Analysis Unit.

21. SA Clemente's training has involved a significant number of specialized courses in the area of child exploitation, including, but not limited to the following: Innocent Images On-Line Sex Crimes Against Children; National Crimes Against Children; On-Line Sex Crimes Against Children; Clinical Forensic Psychology; Behavioral Analysis of Violent Crime; Missing and Exploited Children Seminar; Research Methodologies; MO, Ritual & Signature Advanced Seminar; and Criminology. In addition, he has mentored

13

under, worked with, studied the articles of, and taught with Kenneth V. Lanning, a Supervisory Special Agent, FBI (retired as of October, 2000). SSA Lanning has over the past 27 years authored numerous articles on the topic of sexual victimization of children and behavioral analysis of child molesters. His work forms the basis of the behavioral analysis performed by the FBI in child exploitation cases.

22. SSA Clemente has assisted in the writing of numerous search warrant affidavits and has testified as an expert witness in federal court in the areas of child sex offender behavior, child sexual victimology and child pornography. He has given over 100 presentations and lectures to local, state and federal law enforcement agencies, prosecutors, and health care professional throughout the United States on various topics related to child exploitation, including, but not limited to the following topics: Behavioral Analysis of Child Sex Crimes Offenders, On-Line Sex Crimes Against Children, and Equivocal Death Investigations.

23. As a member of the Behavioral Analysis Unit, SSA Clemente has analyzed and consulted on between one and two hundred child sexual exploitation and victimization cases a year. His analyses are based on all available evidence, including chat records, image collection analysis, collection themes, possession of erotica, possession of sexual paraphernalia, fantasy literature and writings, other relevant acts, and background information. The

14

vast majority of the cases he has analyzed have involved either Preferential or Situational Sex Offenders. His role in these cases has varied as follows: analyzing investigative results for the purpose of making investigative suggestions, providing interview strategies for subjects and victims, and consulting with local, state and federal prosecutors on trial strategies. In addition, SSA Clemente has interviewed between 80 and 100 offenders himself. A behavioral assessment is not a clinical diagnosis; rather, it is a law enforcement tool used to identify and predict offender behavior.

24. SSA Clemente has advised agents with the FBI of the following traits and characteristics that are generally found to exist and be true in cases involving individuals who collect child pornography:

a. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also

15

collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.     The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

d.     The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

e.     The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses

(including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

f. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

25. Based upon your affiant's knowledge, training and experience, affiant knows that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a. The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information.

17

Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

      b.   Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

     26.  Based upon your affiant's knowledge, training and experience affiant knows that searching computerized information

for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

a. The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

27. The residence, located at ███████████████████, Wilmington, Delaware, is located west of the intersection of ████████████, and ████████ The residence is the first house facing ████████████ on the left traveling west from the intersection of

19

████████████ and ████████ The residence is fully described as a small, one level, single family home with a red brick exterior on the front of house with white vinyl sides. The house has a gray painted over hang over the front porch. The front windows are framed in white. The number ████ is located on the front of the house.

## CONCLUSION

28.   Affiant believes the above information clearly shows that the names and addresses of Brian, Ray Alosp, ████████████ Wilmington, Delaware and ████████████ of ████████████ Fairfield, CT, are all fictitious. Affiant believes there is probable cause to believe these fictitious names and addresses have been used to conceal the true identity of Bruce E. Dunlap of ████████ ████████████, Wilmington, Delaware and his illegal activities. Illegal activities which include the possession, receiving, and distribution of sexually explicit child pornographic material through the United States Mail to ████████████ at his residence in Overton, Texas.

29.   Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that an individual who resides at the residence described above is involved in possession, receiving and distribution of child pornography. Your affiant respectfully submits that there is probable cause to believe that an individual with access to the

computer located in the residence described above has violated 18 U.S.C. § 2252. Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violation of 18 U.S.C. § 2252, is located in the residence described above, and this evidence, listed in Attachment B to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

30. Your affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

SA. Anthony H. Crabtree

Special Agent Anthony H. Crabtree
Federal Bureau of Investigation

Sworn and subscribed before me
this _13_ day of _October, 2005_

Honorable _Mary Pat Thynge_
United States District Court

21





WILMINGTON DE 198
PM
17 Feb
2004



OVERTON, TEXAS

75684

756.64+5.144

Wilm, DE
19809



(A)

Glad to hear that you liked the picture. I really did because it is almost a full-length photo, and it shows some skin, and his facial expression is beautiful, too. I understand that the scratch on his chest is real, received while filming one of the scenes, and that he did all of his own stunts except one - which the director demanded be done by a double (and, I don't know which stunt that would have been). Anyway, I thought it was a beautiful picture. I bought it because of that feeling - without asking you beforehand if you were interested in any autographed photos of Jeremy — and because it was slipping through the bidding process and not attracting much attention. I think that happened because the seller didn't list a preview pic with his auction. Most auctions, especially auctions for pictures, list a preview pic along with the title of the auction (in the 2 auctions I just sent you copies of - where one pic went for $152 and the other went for $400, the little picture in the upper left hand corner is a preview (or gallery) pic. In auction listings, that little pic and the auction title are all that show on the listing page. When you click on the title, then you see the details of the auction and the larger-sized pic.) This auction didn't have a preview pic - just a title; when I opened the listing I then saw the picture. And the price was so much less than other full shots - this went for what a head shot normally would sell for (I assume); and it

some other pics don't have, verifying that the auto-
graph is real, and signed by J.S.

(A)

As I've said, since I wasn't acting under your instruction
nor had you even expressed interest in obtaining and autographed
J.S. picture, nor had I asked you anything about it, I
can't now demand any type of payment. I give you
the pic and ask for donations.

OK, that said, let me respond to your thank you note
I'm glad you like the picture, really am. I liked it,
and made a copy of it for myself - which isn't nearly
as nice as the original. In my copy, the whole print has a
reddish tone, and his golden hair is reddish-blond, and,
as I told you earlier, his signature is purple (probably
some type of copywrite protection gimmick). But I think it's
an outstanding shot, I just wish there were a visible bulge
in a certain place.

I don't think I told you that his pics were selling for $500.,
I think I said a couple of people were selling a set of
either 4 or 5 pics (smaller-sized - like 3x5 or something) for
$500. I didn't pay attention to see if they actually
got that price.

I didn't pay over $100., I think I said that I paid
under, or well under $100. I wasn't going to say the
price because I thought you would jump out of your

when I saw this item, comparatively cheap to what other J.S. pics were going for, I jumped on it and won. (A)

I paid $64.80 for it, plus $3.85 postage and then spent $3.85 sending it to you. Whatever donation you wish to give me is fine with me. Regardless, I have a couple other items coming for you which I think you'll like, at no charge. One is a poster for the movie — different than the usual posters I've seen, and I also bought a 48 page picture + storybook of J.S. and P.P., supposed to be an 8½" x 11" inch (soft cover, I imagine) with many full-sized pics in it. It will probably be a week or so before I get them — and I'll send them right on.

Yes, I know the Lambda symbol, I imagine the finished ornament will be beautiful!

Speaking of movies (you spoke about "Get That Kid"), I'll watch for any info on it anywhere — Thursday night on TV I was flipping through the channels and hit on one of the police dramas in mid show, that had a about 12 y.o. boy in his underwear. The nearest I could figure was that a girl his age had talked him into going into a barn under the pretext that they were going to have sex, or something. And when he stripped down she brought out a rope or belt, and said she wanted to tie his hands then was going to do something special. She did, and he was there in just his briefs, hands tied and secured to a wall — then 4 or 5 other early teen girls came out and they trussled him

OCT-12-2005 09:37     FBI Tyler RA                    903 592 1439   P.06

dirt on the floor (some good shots - wish I'd been taping this)
Then the scene cut to detectives trying to find the boy, as he
had disappeared; evidently humiliated. In the end he was Ⓐ
found and everything ended up OK. I remember his name was
"Eric" and he was cute. No credits after the show, so I
don't know who the actor was. Looking at my TV schedule,
I think it may have been this show (although I don't
remember the reference to a lavatory (as I said, I entered mid-
way into the program). If this show goes into repeats, watch
for this episode, titled "Wannabe".

p.m. on 3 13 16
**Without a Trics:** The team
searches for a 12-year-old boy who
was last seen in a school lavatory. (N)
(CC) (TVPG) 10 p.m. on 3 13 16
ER: Carter shows Makemba

CBS

I haven't seen the show yet, but I understand that
"Joan Of Arcadia" begins with scenes of a metropolitan
area, and that opening sequence is Wilmington, DE.
As I said, I haven't seen it yet, so can't verify that.

I think if you contact Columbia House and detail to
them your problem, they'll give you a credit. In
previous business I've done with them, I found them
to be very customer - friendly and very committed to
keeping the customer happy.

OK, I have written a book when I only meant to write a
note, so I'll close. Don't know when you'll get this - today
is Sunday, so no mail pickups at the P.O. or mailboxes, and
tomorrow is a holiday. Don't send any donations until you
can afford it - there is no time frame involved. Take Care
                                                    Brian











7/3

Hi ███████

Ⓑ

Happy 4th of July.

Still busy here - got Spring yardwork out of the way, now I'm helping get a boat ready for the water.

Going to N'awlins (New Orleans) July 12 thru the 16th, just to eat real cajun + creole food, and listen to some good jazz and R+B

Not had much time to fool with our interests on the computer. Have found a new interest - none current, but a good batch of short videos of boys on webcam. I'm really turned on by them because there is no coersion (sp), no force, no direction. What the boys do on webcams (usually just jo) is solely what they want to do when they wish to do it, so you know it's real.

Well, gotta go - hope to write a letter soon. Hoping for a letter from you too soon.

Meantime, hope you had a great 4th

Brian





OVERTON, TX 75684-5144

(C) PH3

Hi:

Just a couple short notes before I get to answering your most recent letter. #1, I have never seen that VW "big foot" commercial again - since we talked about it. Today is the Super Bowl, but they will have all new commercials on it I'm sure - at 2½ million per 30 seconds, I sure would. #2, enclosing a picture that was in the paper yesterday - of the Little League team from DE, with Scott's (blond) picture. Don't return it. They shared recognition as the best team of any sport for the year with the local college team who won the national title in their division (Univ. of Delaware). #3, looked at Peter Pan Peanut butter jars in the supermarket. They had the cartoon Tinker Bell on them; no Jenny Sumpter pic. #4, earlier letter from you mentioned how J Brandis had lost his looks as he grew older; so did Omri Katz - he doesn't look at all like he looked when he was 12, 13?

#5, Any progress with your cousin's wife who offered to help you learn your computer? Maybe her 10 yo son could teach you a few things. For sure, he has some knowledge of operating a computer. You need to learn how to operate the computer before you even think of going online.

#6 Let me know if you got the piece ~~~~~~~~~~~~~~ over on the list you sent me ~~~~~~ french poster. I weighed it at home ~~~~~~~~~~~, but didn't check the weight at the P.O. because the line was too long. So, if there isn't enough postage on it, it will be returned to the fictitious ~~~~~ (return) ~~~~~ it so I would never know you ~~~~~ receive it. Guess I oughta, especially with legal stuff, put my regular (retired) address on mail, huh?

(C)

About your PC, have you learned how to play CD's with
it yet? I'm interested because the CD I sent you has a
few different types of files on it: music (.mp3), pictures (.jpg)
movies (.mpg and/or .avi). I want to find out what will
play and what won't. then I'll know what programs you have
or need for your PC.

Been cold here, today's the 11th day that it hasn't even
reached freezing. Highs in mid 20's and lows in single digits.
We may get above freezing, and maybe get to 40° one day
this week. Snowed here on the 18th, 2nd, and 26+27th - all
small storms of 5" or less, but with no thaw, the snow doesn't
go away. My heater never stops running, and it's natural
gas - which just went up almost $2.00 a cubic foot - my
bill for January is going to be outrageous! Probably $250.
or more - whereas a usual winter bill used to be about $175.
That's for gas + electric - I get a combined bill. Spring and fall
(that's about or almost 8 months) it runs about $80/month and
during cooling season about $120.

I've not been following any type of schedule with my letters -
just writing as I find time. The times you mentioned for delivery
sound about right: 5 or 6 days for 1st class and 3 days for
Priority Mail. I usually don't use P.M. due to the cost, and no
need for that much speed.

I have cable TV and optional digital service. Cable has
always been good here, and the digital makes it some better.
I'm not going to all the extra expense of getting HDTV

or Plasma TV because I'm happy with the picture I get - don't need any more than that - and I don't watch much TV anyway; I can't stand most of the trash that's being foisted on the people now - and ALL THE DAMNED COMMERCIAL. I usually watch Discovery Ch, Learning Ch, A+E, History Ch, and Nat. Geographic., and some movies. But not many movies because I never look at the TV Guide to see what's playing!

I would be somewhat fearful of the gang that Randy brings over to your house - not pleasant type people. So what happens if they have some brews, and a couple joints, and decide to "roll" you for some $$ to get more? Can you + Randy back them down? Sounds scary to me. Now, if Randy brought over some younger white trash, that would be fine! Has Randy been back since they left the mess in the yard? I hope you had a good, and to the point, talk with him, and he straightened things up, like he should.

I'm over the flu, just some slight lingering congestion. I talked to my Dr. about it - he isn't concerned with it - says it won't develop into pneumonia or broncitis, or anything. Also had my annual visit with my cardiologist - and he's not concerned about it, either. So, if they aren't, I'm not. But, the flu really kicked my ass! I can't believe how instantaneous it came on and how it knocked me down, totally!

I have wondered what you were doing about your idea of moving to N.M., but wasn't going to say anything - leave it up to you to mention whenever

(C)

I fully understand your situation with pets, I don't have any right now, just my 36 y.o. 14 y.o., but I've had dogs before (shepard, lab, and collie) and cats.

You ought to, when you can, take a weekend or week long trip up to N.M. and just check it out, get a feel for what's happening, and see how many hot little indian boys are running around. I don't know about So. Texas unless you like Mexicans (they're only cute until about 13, then get fat + hairy quickly). That area was getting overrun with Mexicans back in '84, it had been steadily rising through the years. I doubt if there's many American residents down there anymore. If you keep putting things off, you end up never doing them, you know?

I saw an ad for Columbia House - something like 5 DVD's free, and only have to buy 3 in the next 3 years - or something like that, right? With that deal, even I was interested, and those clubs never interest me. If P.P. was on that list, maybe I'd join.

Well, I won't watch Arrested Development this week - SUPER Bowl - but I'll try to remember to watch it next week. I like Malcolm, but I usually miss it because I'm doing something else.

I never heard of any scandal involving Dream Street. In this area - and on the web - they were popular, then just dropped off the edge of the Earth. No news. Website stopped being updated, etc. So, what happened? Tell me

I remember the scandal with Menudo, they were so popular that they couldn't just disappear, with no explanation; and the mess made all of the papers, nothing like that about Dream Street.

Of you've declared bankruptcy, I've thought that you wouldn't have any problems with bill collectors - they are all supposed to have come to an agreement with the court ruling. Not so?

I think, on some of the small sized pics I've sent you, you can see examples of Jeremy's signature - as some of the pics I have came from an EBay auction, where a guy was auctioning either 4 or 5 autographed pix of Jeremy with a starting bid of $500, or something like that. Don't know if anyone bit on that auction or not.

Speaking again about weather - I worked in a chemical plant you know, looks like a refinery, with thousands of pipes and tanks all over. Until I went into the control room, 15 years ago (all sit down, temp. controlled, computer consoles), all of my work was outside, changing flows through the pipes with valves, loading trucks and tank railcars. And in the winter, valves freeze, pipes freeze, etc. - so in the worst weather, I was out there all shift (12 hours), thawing lines, trying to keep things flowing and warm, etc. So, like it or not, rain, snow, sleet, cold, hot, I was out in it. Cold weather person or not, that's where the work was. After a few weeks, months, years, you

OCT-12-2005  09:40    FBI Tyler RA    903 592 1439    P.15

get acclimated to it, and don't think twice. You grab a bit of heat when you can, or - in the summer, stop in an office for a little cool - then head back out, the job's got to be done, and the money was good. But, those last 15 years, in the control room, were worth every minute I worked outside. Mentally challenging, rather than physically challenging, but I had a nice executives high back leather chair with padded armrests, and a temp. controlled room. Heaven. And instead of getting orders from the control room, I was giving the orders!

You sent the news article about the Texas Twang, I'm well acquainted with it, so my mother lived there from 1964 to 1984, I had friends in Houston before and after those dates, and I have a great (or is it grand?) niece that lives in Vidor. (REAL red-neck country.) So, I've been to Texas many times over the years, and can mimic that twang after I've been there for a few days. Also, the company where I worked has plants in Houston, Corpus Christie, Beaumont, and over in MS and LA, and I've been to most of them - so know that twang well.

Well I think I've covered just about everything there is to cover, so I'm going to get ready for the Super Bowl.

Take care, write when you get a chance.

Brian